IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

DEREK DAYOUB,

     Plaintiff,

vs.                              Civil Action No.

JOHN M. AARON, STEVEN TOPRANI,
GEORGE ROBERTS, WILLIAM NIMAL,
WASHINGTON COUNTY and BOROUGH
OF BURGETTSTOWN,

     Defendants.

**COMPLAINT**

AND NOW, comes the Plaintiff, Derek Dayoub, by and through his attorney,

Gianni Floro, Esquire, and files the following Complaint:

**I.    PARTIES:**

1.    The Plaintiff, Derek Dayoub (hereinafter "Dayoub"), is an adult individual,

who at all relevant times resided at 1463 Spreading Oak Drive, Apt B, Pittsburgh, PA

15220.

2.    The Defendant, John M. ("Mike")  Aaron (hereinafter, "Aaron"), is an adult

individual who was employed as the Chief Detective with the Washington County

Detective Bureau, which works through the Washington County District Attorney's

Office, and who regularly performed his duties at Courthouse Square100 West Beau

Street, Suite 303, Washington, PA 15301.  At all times pertinent to this action, Aaron

was employed as the head law enforcement officer and police policy making official,

and responsible for all duties associated with said position in the aforementioned

bureau or agency.  Aaron's employment with the Washington County Detective Bureau

qualified him as an agent, official, officer and/or employee of Washington County. This action is undertaken against Aaron in his individual capacity only.

3.      The Defendant, Steven Toprani (hereinafter "Toprani"), is an adult individual who was employed by the Washington County District Attorney's Office, and who regularly performed his duties at Courthouse Square 100 West Beau Street, Suite 303, Washington, PA 15301. At all times pertinent to this action, Toprani was employed as the head district attorney and legal policy making official, and responsible for all duties associated with said position in the aforementioned agency. Toprani's employment with the Washington County District Attorney's Office qualified him as an agent, official, officer and/or employee of Washington County. This action is undertaken against Toprani in his individual capacity only.

4.      The Defendant, George Roberts (hereinafter, "Roberts"), is an adult individual who was employed as the Police Chief of the Borough of Burgettstown Police Department, and who regularly performed his duties at 1509 Main St., Burgettstown, PA 15021. At all times pertinent to this action, Roberts was employed as the head law enforcement officer and police policy making official, and responsible for all duties associated with said position in the aforementioned agency. Roberts' employment with the Burgettstown Borough Police Department qualified him as an agent, official, officer and/or employee of Burgettstown. This action is undertaken against Roberts in his individual capacity only.

5.      The Defendant, William Nimal (hereinafter "Nimal"), is an adult individual who was employed as a Police Officer of the McDonald Borough Police Department, and who regularly performed his duties at 151 School Street, McDonald, PA 15057. At

2

all times pertinent to this action, Nimal was employed as a law enforcement officer, and responsible for all duties associated with said position in the aforementioned agency. Roberts' employment with the McDonald Borough Police Department qualified him as an agent, official, officer and/or employee of McDonald Borough.  This action is undertaken against Nimal in his individual capacity only.

6.      The Defendant, Washington County, is a political subdivision of the Commonwealth of Pennsylvania, duly organized as a county possessing the corporate power to sue and be sued.  Washington County is vested with the management and administration of law enforcement in Washington County, by and through its agency, the Washington County District Attorney's Office, in which it is further vested with the supervision and training of police officers so employed.  The county office is located at Courthouse Square, 100 West Beau Street, Suite 702, Washington, PA 15301

7.      The Defendant, Borough of Burgettstown (hereinafter "Burgettstown"), is a political subdivision of the Commonwealth of Pennsylvania, duly organized as a municipality possessing the corporate power to sue and be sued.  Burgettstown's borough office is located at 1509 Main St., Burgettstown, PA 15021.  Burgettstown is vested with the management and administration of law enforcement in the Borough of Burgettstown, by and through its agency, the Burgettstown Borough Police Department, in which it is further vested with the supervision and training of police officers so employed.

## II.      JURISDICTION:

8.      The jurisdiction of this District Court is invoked pursuant to 28 U.S.C. §§ 1331 (federal questions jurisdiction), 1343 (civil rights) and 1367 (supplemental

3

jurisdiction).

9.      The claims for relief and causes of action alleged herein arise under 42 U.S.C. § 1985 and 42 U.S.C. § 1983, for violations of rights secured under the 4th and 14th Amendments to the United States Constitution.  The Plaintiff's pendent state law claims arise under Pennsylvania "common law."

10.      The various acts and omissions alleged herein were engaged in and carried out by, between and among the individual Defendants, while said Defendants were employed by Washington County, the Borough of Burgettstown, and the Borough of McDonald.

11.      All of the various acts and omissions alleged herein pertaining to 42 U.S.C. § 1983 and 42 U.S.C. § 1985 were engaged in and carried out under the color of State law for which the individual Defendants are liable individually.

12.      All of the various acts alleged herein pertaining to the Commonwealth of Pennsylvania "common law," were intentional acts and within the scope of the Defendant Aaron and Toprani's employment with Washington County, Robert's employment with the Borough of Burgettstown, and Nimal's employment with the Borough of McDonald.

## III.   FACTS:

13.      Retired Police Officer Bob Price, and his daughter Amber Price, were acquaintances and formerly friends of the Defendant Aaron.

14.      Aaron became a police officer, and a personal vendetta developed between himself and a former supervisor for Smith Township, Joe Murray (hereinafter "Murray").  This vendetta has bearing on these events because it is a driving force

behind Aaron's actions, or at least part of the reason that he acted the way he did in regard to Dayoub.

15.     While Aaron was a police officer in Pennsylvania, he and Murray were both vying for the position of Chief Deputy of the Washington County Sheriff's Department.  Eventually, after a heated contest, Murray was appointed to the position of Chief Deputy position.  These events created a great deal of animus between Aaron and Murray, at least as far as Aaron was concerned, and later became a motivation for Aaron to act the way he did toward Dayoub.

16.     Eventually, Aaron became the Chief Detective for Washington County, Pennsylvania, under the Office of the District Attorney, Defendant Toprani.

17.     Dayoub met Aaron at a Christmas party at Bob Price's house.

18.     Dayoub is a citizen of the United States of America.  He is of Syrian descent and is a Syrian Christian.

19.     Dayoub has had difficulties with Aaron since the two first met, at that time Dayoub was a police officer for Oakdale Borough, Pennsylvania.

20.     At that time, in 2007, Dayoub was first introduced to Aaron at a Christmas party at Bob Price's house, when Dayoub accompanied his friend, Amber Price, the daughter of Aaron's then friend, Bob Price.

21.     Aaron immediately showed hostility toward Dayoub, stemming from the fact that Aaron is Jewish and Dayoub is of Middle Eastern descent.  This hostility frequently surfaced and took the form of Aaron calling Dayoub a "terrorist" and making derogatory comments about Dayoub's religious beliefs and ancestry, even though Dayoub was considered to be a Christian and did not feel that Aaron should question

5

his religious beliefs.

22.     These problems only escalated when Dayoub was hired as a police officer in Smith Township, Pennsylvania in October of 2007 and in Center Township, Pennsylvania in January of 2008.

23.     On numerous occasions, Aaron and Toprani came into the Smith Township Police Department and took the files of the cases on which Dayoub was working.  When they were rebuffed by Dayoub's Chief of Police, Aaron and Toprani obtained subpoenas for the case files.  It seemed as though Aaron was looking for an instance where Dayoub had taken a misstep in his police work in order to retaliate against him for his race and ancestery.

24.     On several instances, after looking through the files, Aaron had the charges against the suspects dropped, never giving a reason or rationale for the conduct, even though Dayoub had developed strong cases against the suspects.

25.     On one of these instances, in November of 2008, Aaron even forced Dayoub to take a polygraph test and a drug test via urine sample.  At this point, Aaron never asked Dayoub if he wanted his attorney present, did not have someone else administer the test, and even refused to have anyone besides himself and Dayoub present for the test.  Dayoub passed both of these tests, but Aaron never gave a reason for the administration of these tests.  He even told Dayoub during this episode, "[y]ou're on the path to getting arrested and being sued civilly."

26.     On September 27, 2008, Dayoub, in the course of his duty as a police officer, arrested John Dvorsak for assault.

27.     At this time, Dayoub was dispatched to investigate teenagers breaking

into cars in the early morning near the area of the Slovan Fire Department.

28.     He investigated and had taken two teens into custody when Dvorsak arrived on the scene in his car.

29.     His son was one of the teens that Dayoub had handcuffed, and Dvorsak attempted to talk to his son, interfering with Dayoub's then continuing investigation.

30.     When Dayoub asked Dvorsak to stay away from his son until Dayoub's scene investigation was complete, Dvorsak attempted to take his son away from the area.  Another request to leave the boy alone from Dayoub, prompted Dvorsak into a fighting stance.

31.     Dayoub had no handcuffs left to restrain Dvorsak, and Dvorsak attacked, jumping on Dayoub's back.  Dayoub defended himself, utilizing pepper spray, until another officer arrived on the scene.

32.     This officer was Chief Joe Yoest from Midway's Police Department.  He stepped in for Dayoub and was able to subdue Dvorsak and take him into custody.

33.     Chief Yoest wrote a police report that detailed the incident in the same particulars.

34.     One of the other officers that arrived on the scene was Defendant Nimal, a police officer from the Borough of McDonald who had been fired by Smith Township prior to his employment with the Borough of McDonald.  Nimal arrived after Dvorsak was taken into custody and all of the events of the night had already transpired.

35.     Upon information and belief, Nimal is a friend of Dvorsak.

36.     Later, Nimal's "testimony" regarding the events of this night would be an integral part of why charges were levied against Dayoub, despite the fact that Nimal

was not at the scene to witness anything that transpired.  Later, Nimal showed remorse for his unlawful actions by seeking out Dayoub and attempting to apologize to him.

37.    The next month, on October 11, 2008, Dayoub and two other police officers of Smith Township entered a McDonald's restaurant that the three frequented in Burgettstown, PA.

38.    One of the workers at the time, Brandon Lancaster (hereinafter "Lancaster"), greeted the officers, as he was familiar with them and had something of a social relationship with them.

39.    Another one of the workers made a joke about Lancaster making comments about the police officers to others, which the worker, Lancaster, and the police officers knew was not true.

40.    In response to this, Dayoub, who was aware of the joking nature of the comments, patted Lancaster on the shoulder in a joking manner, saying "[i]t's okay buddy."

41.    Because the McDonald's workers had just finished mopping the floor when the police officers entered the restaurant, it was slippery, Lancaster slipped and fell after he had begun walking away, and he began crawling on the floor.

42.    The incident was captured by the video surveillance cameras at the McDonald's.

43.    Lancaster did not feel that anything inappropriate or criminal occurred, and therefore he did not attempt to press charges or talk to police about the event.

44.    That is what Lancaster told Aaron and Roberts when they questioned him about the incident.  This response did not satisfy the two; though they were sure that

Lancaster was protecting Dayoub because they alleged that he feared retaliation from Dayoub. Aaron and Roberts pressed Lancaster, and when Lancaster refused to change his story, they threatened him until Lancaster agreed to say that Dayoub had assaulted him. Lancaster then sought out Dayoub the next month and recounted to him what Aaron and Roberts had done.

45. According to Lancaster, he was still surprised when he discovered that charges had been filed against Dayoub as a result of the McDonald's incident.

46. Lancaster provided a statement to Smith Township Chief of Police, Winford Bernie Larue (hereinafter "Larue"), who recorded the statement on a cassette tape.

47. Other persons involved with the situation were also surprised when Dayoub was arrested; Bob Price had inquired about the status of the investigation because his daughter, Amber price, and Dayoub, Amber Price's friend, were the subjects of that investigation. Aaron had told Bob Price that the investigation was closed and nothing was happening with the case.

48. Because of this incident, Dayoub was arrested by Aaron and Toprani for simple assault, official oppression, and harassment on January 14, 2009. He was placed in a holding cell at the Washington County Barracks of the Pennsylvania State Police from the time of his arrest, at or about 4:00 PM until midnight. The case number is CP-63-CR-0000936-2009.

49. At this time, Aaron and Toprani question Dayoub about Murray and his alleged activities, about which Dayoub knew nothing. Toprani was involved in the interrogation of Dayoub.

50.     During his incarceration that night, Aaron attempted to elicit information from Dayoub about the alleged gambling habits of Murray, the former supervisor of Smith Township and the police officer who was promoted to Chief Deputy Sheriff of Washington County Sheriff's Department instead of Aaron.  In addition, Aaron forced Dayoub to be fingerprinted, although there was no fingerprint order signed by a judge. Aaron also forced Dayoub to have his photograph taken, in spite of the fact that the order from the court that Aaron obtained through falsified information did not require one.

51.     The troopers who were told by Aaron to fingerprint Dayoub initially refused because there was no fingerprint order.  Nevertheless, Aaron insisted that Dayoub be fingerprinted.

52.     A few days before this, Amber Price was informed that Roberts and Aaron were relishing in how they had been able to get a different police officer, Mike North, arrested and stated that Dayoub and Amber Price were "next."  Roberts told this to Amber Price and Larue.

53.     On January 15, 2009, Dayoub was released on his own recognizance.

54.     Just before Aaron and Roberts forced Lancaster to lie about the McDonald's incident with Dayoub, Dayoub found a surveillance camera in one of the air vents of the Burgettstown Borough Police Department.

55.     The camera was facing the bathroom, where some of the female officers and staff members were forced to change because not all of the officers and staff members at the station had lockers.

56.     Dayoub and Amber Price repeatedly called the Pennsylvania Attorney

General's office and the Washington County District Attorney's office regarding the camera.

57. The two went so far as to have Amber and Bob Price, who were friends with Aaron, meet Aaron at his home to discuss the cameras. Aaron admitted to installing the cameras as a favor to Roberts, and was very irritated at the Prices' inquiry.

58. It was about this time that Aaron began warning Bob Price. He would call Bob Price and tell him to keep his daughter, Amber Price, away from Dayoub. Aaron would add to these warnings promises to get Dayoub fired from his job, saying Dayoub's "time was coming."

59. On February 5, 2009, Dayoub was again arrested by Aaron and charged with assault and official oppression, which stemmed from the arrest of John Dvorsak (referenced in ¶ 26). The case number CP-63-CR-0000937-2009.

60. Upon information and belief, Aaron contacted Dvorsak after Dvorsak was arrest by Dayoub on September 27, 2008. Aaron agreed to drop all charges against Dvorsak, if he would accuse Dayoub of assaulting him during the arrest. Dvorsak agreed, and all charges were dropped against him.

61. This agreement is indirectly evidenced by a magistrate's statement to a private investigator who was hired by Dayoub's criminal defense attorney, that Dvorsak had told the magistrate that Dvorsak had assaulted Dayoub.

62. In addition to Dvorsak's testimony, Nimal's testimony was the driving force behind the initiation of charges against Dayoub. Nimal stated that Dayoub had used an entire can of pepper spray on Dvorsak, and Dayoub assaulted Dvorsak. Nimal testified to the impropriety of these acts, though he was not a certified use of force instructor, or

11

even a police officer of a higher rank than Dayoub, meaning that Nimal had no basis for making these determinations, and he lacked the qualifications to do so as well. Also Nimal's testimony was given in spite of the fact that he was not present for any of the events of that night, as he did not arrive on the scene until everyone was already subdued and in custody, and in spite of the conflicting report of Chief Joe Yoest, a police officer who had arrived on the scene during the events of that night and one who had participated in them.

63.     Aaron even went so far as to contact Chief Joe Yoest of the Midway Police Department, the officer that assisted Dayoub in his arrest of Dvorsak, and threatened him so that Yoest would change his police report of the incident. Yoest refused Aaron's requests and threats, and even contacted the FBI regarding the incident.

64.     Because of this second charge, Dayoub was released from his police officer position at both Smith and Center Townships in April of 2009.

65.     On April 21, 2009, the two criminal cases against Dayoub were waived for trial.

66.     In addition to Dayoub, Amber Price also had criminal charges levied against her.

67.     After Amber's arrest, Aaron wrote a letter to Bob Price apologizing for the charges against Amber, and saying that she had aligned herself with the wrong people. Aaron also showed remorse for what had happened with Dayoub, stating that he would look out for Amber and would make sure that Dayoub received the same deal.

68.     Both criminal cases against Dayoub were predicated on falsified

information.

69.    The false information was used with full knowledge of its falsity by Chief George Roberts, and especially Chief Detective John M. Aaron.

70.    Additionally, Aaron and Toprani pressured Dayoub before his preliminary hearings to provide information regarding alleged gambling habits of the former Smith Township Supervisor, Murray.

71.    In addition, Toprani elected to continue these criminal cases in spite of the fact that Lancaster, Dayoub, and other witnesses informed Toprani of the false information.  Toprani chose to ignore this information, and proceed with the case, which after the multiple admonitions of several persons involved in the occurrences can only be characterized as acting  with deliberate indifference as to the veracity of the information.

72.    Toprani did more than just proceed with a criminal case that he knew or should have known to be based upon falsified information, he continuously, incessantly, and unabashedly berated Dayoub in the media, with the help of Aaron, bringing up the case whenever Toprani was able.

73.    On October 7, 2009, Toprani finally admitted to himself how little evidence existed against Dayoub, and he made a Nolle Prosequi Motion in Dayoub's cases to withdraw the charges.

74.    On December 10, 2009, Judge John F. DiSalle (hereinafter "Judge DiSalle") refused to sign the Nolle Prosequi Motion.

75.    Throughout the next few months, Dayoub's Attorney re-submitted the motion multiple times, but Judge DiSalle continually denied it, even though Toprani

agreed to the Nolle Prosequi.

76.    Finally, in April of 2011, Judge DiSalle granted the motion, but only if Dayoub would pay $1,600.00 in restitution to the "crimes victims."  Judge DiSalle required this of Dayoub despite the fact that Toprani wanted to drop all charges.

77.    Though the cases were withdrawn by a Nolle Prosequi Motion because of a crippling lack of evidence, Toprani refused to recommend an expungement of Dayoub's record without providing any reason for the refusal.

78.    Throughout this entire time, Aaron continually contacted Dayoub's girlfriend's father, Mr. Price, and warned him to keep Dayoub's girlfriend, Amber Price, away from Dayoub.  In these conversations, Aaron promised to get Dayoub fired from his job, saying Dayoub's "time was coming."

79.    In addition, Aaron continuously called Dayoub a "terrorist."  He also made derogatory reference's to Dayoub's Syrian heritage.

80.    Because of the despicable actions of Aaron and the other collaborators, Dayoub wrongfully lost his employment, or was suspended therefrom, has been forced to defend himself against baseless charges and bear the financial burden thereof, has been unable to seek employment as a police office for which he is well qualified because of which he has suffered severe financial difficulty, and has suffered emotional and psychological effects, such as bouts of insomnia, fear of performing his duties when he was still a police officer, a general fear of working and traveling to and within the jurisdictional areas of the collaborators.  Dayoub also has suffered mental and emotional torment that was instilled in him because of these ordeals.

14

## COUNT I
### DEREK DAYOUB v. JOHN M. AARON, GEORGE ROBERTS, STEVEN TOPRANI, WILLIAM NIMAL, WASHINGTON COUNTY and BOROUGH OF BURGETTSTOWN
### VIOLATION OF PLAINTIFF'S CIVIL RIGHTS 42 U.S.C. §§1983, *et seq.*
### MALICIOUS PROSECUTION

81.     Paragraphs 1 through 80 are incorporated by reference as fully as if they were set forth at length herein.

82.     The Defendant, Washington County, by and through its Chief Detective, Defendant John M.  Aaron, and its former District Attorney, Defendant Steven Toprani, brought criminal charges and proceedings against Dayoub, the docket numbers of which are CP-63-CR-0000936-2009 and CP-63-CR-0000937-2009.

83.     These  proceedings were brought against Dayoub without probable cause.  This is a fact fully known and appreciated by Aaron and Toprani, as Aaron was forced to obtain false information by way of intimidation of and bargaining with "witnesses," and Toprani participated in certain investigatory events that showed the falseness of the information.

84.     The institution of these proceedings were enabled by the false testimony of Nimal, a police officer of a political subdivision of Pennsylvania, through his capacity as a police officer.  He gave this false testimony for the purpose of instituting criminal proceedings against Dayoub.

85.     Aaron brought these proceedings against Dayoub for a purpose different than bringing Dayoub to justice.

86.     Aaron brought these proceedings against Dayoub for a malicious purpose of intimidating Dayoub, which was desirous to Aaron because of personal prejudices

15

against Dayoub, including but not limited to, Aaron's personal prejudices against Dayoub's ancestry.

87.   Nimal helped in bringing these proceedings against Dayoub in order to retaliate against Dayoub for arresting his friend, Dvorsak, and due to his personal animus toward Smith Township and its police officers because he was fired by that township prior to his employment with McDonald.

88.   Because of these charges and proceedings, Dayoub suffered deprivation of liberty, consistent with the concept of seizure, in that:

    a.   he was arrested twice and detained by police in a holding cell;

    b.   he lost his employment as a police officer and was unable to seek gainful employment in a similar position, for which he was well qualified; and,

    c.   he was forced to defend himself against false and baseless charges, accruing all expenses associated with doing so.

89.   The criminal charges and proceedings brought against Dayoub ended in Dayoub's favor in the form of a Nolle Prosequi Motion by District Attorney Toprani, filed because of a lack of evidence against Dayoub and an excess of evidence in his favor, and granted as of April 5, 2011.

90.   The authority Aaron and Toprani possessed as Washington County's Chief Detective and District Attorney, together with their policy making authority, combined with the authority possessed by Roberts as Burgettstown's Chief law enforcement official, together with his policy making authority, the multiple occurrences in this matter, all show and demonstrate that Washington County and Burgettstown had a policy of bringing about false charges against Dayoub for the purpose of harassing and intimidating him because of his descent, race and ancestry; or in retaliation for

16

Smith Township's termination of Nimal, of which Dayoub suffered a deprivation of his liberties, right, privileges and immunities.  All of the aforesaid activities are consistent with the policy, custom and practice of Washington and Burgettstown, and/or its officers and officials, and policy makers, to bring false charges against Dayoub, and to specifically deprive citizens of their constitutionally protected rights, by persuing false charges against individuals for unlawful motives.

91.    In addition to a deprivation of his civil rights, as a result of the baseless charges and proceedings, the Defendants' actions also caused him to be ostracized, suffer emotional distress, anxiety, embarrassment, a lost employment, which has resulted in lost wages and financial difficulties, and a loss of his future horizons.

WHEREFORE, the Plaintiff, Derek Dayoub, respectfully requests an award in his favor and against the Defendants, John M. Aaron, Steven Toprani, Washington County, William Nimal, George Roberts and the Borough of Burgettstown, jointly and severally, in an amount in excess of $75,000.00, an award of attorneys fees and costs, plus an award of punitive damages against the individual Defendants, John M. Aaron, Steven Toprani, William Nimal, and George Roberts.

**COUNT II**
**DEREK DAYOUB v. JOHN M. AARON, GEORGE ROBERTS, STEVEN TOPRANI,**
**WILLIAM NIMAL, WASHINGTON COUNTY and BOROUGH OF BURGETTSTOWN**
**VIOLATION OF PLAINTIFF'S CIVIL RIGHTS 42 U.S.C. §§1983, *et seq.***
**MALICIOUS ABUSE OF PROCESS**

92.    Paragraphs 1 through 91 are incorporated by reference as fully as if they were set forth at length herein.

93.    The Defendant, Washington County, by and through its Chief Detective, Defendant John M. Aaron, and Burgettstown, through the actions of and with the

17

assistance of the Burgettstown Police Chief, George Roberts, brought criminal charges against Dayoub, the docket numbers of which are CP-63-CR-0000936-2009 and CP-63-CR-0000937-2009.

94.    The charges were brought against Dayoub and the corresponding criminal proceedings continued through the actions of Aaron and Toprani, as agents, ostensible agents, officers, officials, and/or independent contractors of Washington, and Roberts as an agent, ostensible agent, officer, official, and/or independent contractor of Burgettstown Borough.

95.    The charges were brought against Dayoub despite the knowledge of Aaron, Toprani, Roberts and Nimal, that the charges were false and baseless.

96.    Aaron, Toprani, Roberts and Nimal knew of the charges' falsity because they procured the "evidence" to support one these charges through intimidation tactics; Aaron and Roberts threatened Brandon Lancaster into saying that Dayoub had assaulted him.

97.    Aaron also knew that the charges against Dayoub regarding the Dvorsak allegations were similarly false, as Aaron made a deal with Dvorsak for Aaron have all charges against Dvorsak dropped in return for Dvorsak saying that Dayoub had assaulted him.  He even attempted to have the police report that discussed this incident changed by threatening Officer Joe Yoest of Midway Borough, so that the police report would be in accordance with false testimony that Nimal gave.

98.    In other words, Aaron and Roberts knowingly falsified information in order to have Dayoub arrested and charged with criminal conduct, acts which Toprani and Nimal participated.

99.    The untruth of this information is evidenced by a local magistrate saying that Dvorsak had told him that Dvorsak had assaulted Dayoub, and Lancaster telling Dayoub what Aaron had done.

100.    Both proceedings were perpetuated by Toprani, who had also participated in certain investigatory event prior to bringing the case before the court.  During both the investigations and his subsequent prosecution, Toprani knowingly proceeded with false information, or, at least, he exhibited deliberate indifference as to whether the information given to him by Aaron, Roberts, Dvorsak, Dayoub, Lancaster, and other witness' was true.

      a.    Toprani should have known that Dvorsak was not telling the truth because he had testified before a Magisterial District Judge that he had assaulted Dayoub instead of the other way around;

      b.    Lancaster had informed Toprani that Dayoub did not assault him, and Roberts and Aaron had threatened him in order to get Lancaster to say Dayoub had assaulted him; and

      c.    through the course of ordinary attorney investigation, for example viewing the McDonald's restaurant video surveillance footage, Toprani could and should have become aware that Aaron and Roberts had falsified the information in the first complaint and Aaron had falsified information in the second complaint.

101.     In spite of the information at Toprani's disposal, Toprani not only proceeded with the criminal case, but he and Aaron publicly denounced, berated, and humiliated Dayoub in the press.

102.    Toprani and Aaron continually evidenced their abuse of the criminal process by repeatedly pressuring Dayoub to give up information on Murray's alleged gambling habits.  After each time that Dayoub refused because he had no information about those alleged events, either Toprani, Aaron, or both said something to the effect

19

of, "I guess we will just have to continue with this hearing."

103.   In addition, Toprani has twice refused Dayoub's request for expungement even though Toprani, himself, motioned for the charges against Dayoub to be withdrawn.  Further the District Attorney's Office of Washington County has refused to grant Dayoub's third request for expungement, for which the office gave no reasoning, nor did it state which attorney had refused the request.  Because of Toprani and Washington County's refusal to grant Dayoub's request for expungement of the baseless, false, and maliciously instituted charges, Dayoub has been forced to request a hearing and employ an additional attorney for said hearing.  The refusals by Toprani and Washington County, which were made despite both parties' knowledge that the charges against Dayoub were false, has exacerbated Dayoub's legal and employment woes, essentially extending the criminal cases against Dayoub.

104.   Both proceedings initiated against Dayoub ended in his favor, *i.e.*, the charges were withdrawn by way of a *Nolle Prosequi* Motion, which Toprani repeatedly made because of a lack of evidence, and which was finally granted on April 5, 2011.

105.   Aaron and Roberts had these charges levied against Dayoub, and Toprani continued the criminal process for a purpose other than bringing Dayoub to justice. They did so because of his personal prejudices against Dayoub and because of Dayoub's ancestry, which is clearly an abuse of the criminal justice process.

106.   Because of these baseless charges, brought about by Aaron's falsifying of information, Dayoub has suffered a deprivation of liberty:

        a.      Dayoub was arrested twice and detained by police in a holding cell;

        b.      Dayoub was forced to defend himself against false charges;

c.    Dayoub feared to perform his duties as a police officer because of the possibility of having charges levied against him without cause; and

d.    Dayoub lost his position as a police officer in both Smith and Center Townships, and has been able to seek employment as a police officer, for which he is well qualified, because of these abuses.

107.    The authority Aaron and Toprani possessed as Washington County's Chief Detective and District Attorney, together with their policy making authority, combined with the authority possessed by Roberts as Burgettstown's Chief law enforcement official, together with his policy making authority, the multiple occurrences in this matter, all show and demonstrate that Washington County and Burgettstown had a policy of bringing about false charges against Dayoub for the purpose of harassing and intimidating him because of his descent, race and ancestry; or in retaliation for Smith Township's termination of Nimal, of which Dayoub suffered a deprivation of his liberties, right, privileges and immunities.  All of the aforesaid activities are consistent with the policy, custom and practice of Washington and Burgettstown, and/or its officers and officials, and policy makers, to bring false charges against Dayoub, and to specifically deprive citizens of their constitutionally protected rights, by persuing false charges against individuals for unlawful motives.

108.    In addition to a deprivation of his civil rights, as a result of the baseless charges and proceedings, Dayoub is ostracized, suffers emotional distress, anxiety, embarrassment, lost employment, which has resulted in lost wages and financial difficulties.

WHEREFORE, the Plaintiff, Derek Dayoub, respectfully requests an award in his favor and against the Defendants, John M. Aaron, Steven Toprani, Washington County,

21

William Nimal, George Roberts and the Borough of Burgettstown, jointly and severally, in an amount in excess of $75,000.00, an award of attorneys fees and costs, plus an award of punitive damages against the individual Defendants, John M. Aaron, Steven Toprani, William Nimal, and George Roberts.

**COUNT III**
**DEREK DAYOUB v. JOHN M. AARON, GEORGE ROBERTS,**
**STEVEN TOPRANI and WILLIAM NIMAL**
**PENNSYLVANIA STATE COMMON LAW**
**MALICIOUS PROSECUTION/MALICIOUS ABUSE OF PROCESS**

109.   Paragraphs 1 through 108 are incorporated by reference as fully as if they were set forth at length herein.

110.   Aaron, Toprani, Roberts and Nimal, were all involved in the criminal charges against Dayoub, the docket numbers of which are CP-63-CR-0000936-2009 and CP-63-CR-0000937-2009.

111.   The charges were brought against Dayoub despite Aaron, Toprani, Nimal and Roberts knowing that they were false and baseless charges.

112.   Aaron knew of their falsity because he, with Roberts' assistance, procured the "evidence" to support these charges through backroom deals and intimidation tactics.

    a.   Aaron and Roberts threatened Brandon Lancaster into saying that Dayoub had assaulted him;

    b.   Aaron made a deal with Dvorsak for Aaron have all charges against Dvorsak dropped in return for Dvorsak saying that Dayoub had assaulted him; and

    c.   Aaron attempted to have the police report that detailed the events of Dvorsak's arrest changed by threatening Midway Police Officer Joe Yoest.

113.   In other words, Aaron knowingly falsified information in order to have

22

Dayoub arrested and charged with criminal conduct.

114. The untruth of this information is evidenced by a local magistrate saying that Dvorsak had told him that Dvorsak had assaulted Dayoub, and Lancaster telling Dayoub what Aaron had done.

115. In addition, William Nimal's false testimony regarding the events that led to Dvorsak's arrest was the main reason that criminal charges were instituted. He falsely testified in his police report that Dayoub had assaulted Dvorsak and used an entire can of pepper spray against him. Nimal testified in this manner for the malicious purpose of retaliation against Dayoub for arresting his friend, Dvorsak, and not for the purpose of bring Dayoub to justice.

116. Both proceedings were perpetuated by Toprani, in which he exhibited deliberate indifference as to the veracity of the information given to him by Aaron, Roberts, and Dvorsak because through due diligence, as that standard is applied to a prosecutor, he would have been able to know that the information was false.

117. Both proceedings were also perpetuated by Toprani and Aaron for the malicious purpose of pressuring information out of Dayoub regarding Murray's alleged gambling habits; however, Dayoub did not have such information. This malicious purpose is further evidenced by the fact that Toprani, Aaron, or both commented that they would have to "continue with the hearing" after each time that Dayoub stated that he did not have information regarding Murray's alleged gambling habits.

118. Both proceedings initiated against Dayoub ended in his favor; the charges were withdrawn by way of a Nolle Prosequi Motion, which Toprani repeatedly made because of a lack of evidence.

119.   Aaron and Roberts had these charges levied against Dayoub, and Toprani continued the criminal process for a purpose other than bringing Dayoub to justice. They did so because of his personal prejudices against Dayoub and because of Dayoub's ancestry.

120.   In addition Toprani refused to allow Dayoub's request for expungement even though Toprani, himself, motioned for the charges against Dayoub to be withdrawn.  This refusal exacerbated Dayoub's legal and employment woes, essentially extending the criminal cases against Dayoub.

121.   Because of these baseless charges, brought about by Aaron's falsifying of information, Dayoub has suffered a deprivation of liberty:

      a.     Dayoub was arrested twice;

      b.     Dayoub was forced to defend himself against false charges;

      c.     Dayoub feared to perform his duties as a police officer because of the possibility of having charges levied against him without cause; and

      d.     Dayoub lost his position as a police officer in both Smith and Center Townships, and has since been unable to seek employment as a police officer, for which he is well qualified, because of these abuses.

122.   The authority Aaron possessed as Washington County's Chief Detective, that which Roberts possessed as Chief of Police of the Borough of Burgettstown, and that which Toprani possessed as Washington County's District Attorney, combined with the multiple occurrences, shows that these individuals abused their state authority and brought about false charges against Dayoub for the purpose of harassing and intimidating him because of his descent.

123.   In addition to a deprivation of his civil rights, as a result of the baseless

24

charges and proceedings, Dayoub has suffered defamation of character that caused him to be ostracized, distress, anxiety, embarrassment, lost employment, which has resulted in lost wages and financial difficulties.

WHEREFORE, the Plaintiff, Derek Dayoub, respectfully requests an award in his favor and against the Defendants, John M. Aaron, George Roberts, Steve Toprani, and William Nimal, jointly and severally, of an amount in excess of $75,000.00, an award of attorneys fees and costs, plus an award of punitive damages against the Defendants, John M. Aaron, George Roberts, Steve Toprani, and William Nimal, jointly and severally.

**COUNT IV**
**DEREK DAYOUB v. JOHN M. AARON, GEORGE ROBERTS, STEVEN TOPRANI, and WILLIAM NIMAL**
**VIOLATION OF PLAINTIFF'S CIVIL RIGHTS 42 U.S.C. § 1985, et seq.**
**CONSPIRACY TO INTERFERE WITH CIVIL RIGHTS**

124. Paragraphs 1 through 123 are incorporated by reference as fully as if they were set forth at length herein.

125. Aaron, Toprani, and Roberts interfered with Dayoub's civil rights. They interfered with Dayoub's right to freedom of religion, his right to be free from racial discrimination, Dayoub's right to seek lawful and gainful employment for which he is well qualified, and his right to be free from malicious abuses of process against him.

126. Aaron, Toprani, and Roberts did this by instituting false and baseless charges against Dayoub. Aaron and Roberts further achieved this goal by arresting Dayoub without probable cause, with full knowledge of both lack of probable cause and the falsity of the information.

127. The lack of probable cause is further evidenced by the fact that both

25

proceedings ended in Dayoub's favor, as the charges were withdrawn by Washington County because of a lack of evidence.

128.   The untruth of this information is further evidenced by a local magistrate saying that Dvorsak had told him that Dvorsak had assaulted Dayoub.  In addition, Lancaster has admitted to Dayoub that Aaron and Roberts threatened him into lying about the events that occurred at the McDonald's.

129.   In order to accomplish these unlawful goals, Aaron, Toprani, and Roberts conspired together, and they also conspired with Dvorsak, and intimidated Lancaster into joining their scheme.  Aaron and Roberts conspired with each other in order to approach Lancaster, and assisted, *i.e.* conspired with, each other in intimidating Lancaster into lying about the events of October 11, 2008.  In addition, Aaron conspired with Dvorsak and Nimal to have Dvorsak lie about the events of September 27, 2008, and attempted to intimidate Officer Joe Yoest into joining the scheme as well by changing the police report regarding the Dvorsak incident to be in accordance with Nimal's false report in the criminal complaint.

130.   As further evidence of this conspiracy, and Aaron's aforethought, Aaron warned those near Dayoub, Bob and Amber Price, about the conspiracy by telling them that he would get Dayoub fired and to stay away from Dayoub.

131.   As further evidence of this conspiracy, Aaron, in his letter to Bob Price stated that he would protect Amber, who was caught up in Aaron's unlawful acts, and would give Dayoub the same deal, expressing remorse for his actions.

132.   As further evidence of this conspiracy, Aaron and Toprani repeatedly attempted to elicit information from Dayoub regarding Murray's alleged gambling habits.

This desire to bring down Murray is left over from when Aaron was passed over for the Chief Deputy position in the Washington County Sheriff's Office.  In addition, Aaron and Toprani continually attempted to convince Dayoub to provide information about Murray by offering to drop all charges before many of Dayoub's court appearances.

133.   Aaron and Roberts brought about this conspiracy and performed these unlawful acts due to their own personal prejudices because Dayoub is of Syrian (a.k.a. Middle Eastern) descent and practices Syrian Christianity.

134.   In addition to a deprivation of his civil rights, as a result of the baseless charges and proceedings, Dayoub has suffered defamation of character that caused him to be ostracized, distress, anxiety, embarrassment, lost employment, which has resulted in lost wages and financial difficulties.

WHEREFORE, the Plaintiff, Derek Dayoub, respectfully requests an award in his favor and against the Defendants, John M. Aaron, George Roberts, Steve Toprani, and William Nimal, jointly and severally, of an amount in excess of $75,000.00, an award of attorneys fees and costs, plus an award of punitive damages against the Defendants, John M. Aaron, George Roberts, Steve Toprani, and William Nimal, jointly and severally.

135.   A jury trial is demanded.

Respectfully submitted,

/s/  Gianni Floro
Gianni Floro, Esquire
PA ID No. 85837
Attorney for the Plaintiff
935 Beaver Grade Road, Suite 6
Moon Township, PA  15108
P:  (412) 264-6040
F:  (412) 264-2510
E:  gfloro84@comcast.net

27